UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WALTER MCCOTTRELL,

    Petitioner,

    v.

ROBERT L. AYERS, JR, Warden,

    Respondent.
_____/

No. C 07-1089 PJH

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Before the court is the petition for writ of habeas corpus filed by state prisoner, Walter McCottrell ("McCottrell"), pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer, supported by a memorandum of points and authorities, and also provided exhibits for the court. Having reviewed the parties' papers, the record, and having carefully considered their arguments and the relevant legal authorities, the court hereby DENIES the petition.

## BACKGROUND

**A.    Procedural History**

In 1977, McCottrell stood trial in two different state superior courts in California for three separate offenses he committed at locations between San Jose, California and San Diego, California. First, McCottrell stood trial in Santa Clara County Superior Court for the third of his three commitment offenses, and was convicted of kidnapping for robbery. On October 28, 1977, the Santa Clara court sentenced him to seven years to life in prison. That same year, McCottrell also pled guilty in the San Diego County Superior Court to two counts of robbery, which comprised his first two commitment offenses that he committed in San Diego, California. The San Diego court sentenced him to fifteen years to life with a five

years to life enhancement for use of a firearm. McCottrell continues to serve the sentences from the courts of both counties concurrently.

In 2005, McCottrell filed a state habeas petition with the Santa Clara County Superior Court which, among other things, specifically challenged the California Board of Parole Hearings' ("Board") 2004 parole denial as a violation of his right to due process. The court denied his petition in a written opinion on November 10, 2005. McCottrell proceeded to file a habeas petition with the California Court of Appeal, which was summarily denied on July 17, 2006. The California Supreme Court denied McCottrell's subsequent petition for review on October 11, 2006. On February 22, 2007, McCottrell filed the current federal habeas petition.

**B.    Factual History**

McCottrell's conviction stems from the following facts, a more complete version of which may be found in the Board's Parole Consideration Hearing transcript from October 18, 2004. *See* Pet.'s Exh. V. In 1976, McCottrell was serving a term of 50 to 100 years in Illinois state prison, when he escaped and fled to California.[1] *Id.* at 26. On January 16, 1977, McCottrell committed the first of three offenses which led to his current California conviction. *Id.* at 20. McCottrell robbed and shot a hotel desk clerk and an elevator operator at the St. James Motel in San Diego, California. *Id.* at 20, 89.

On February 6, 1977, McCottrell committed his second offense in San Diego, California, robbing a taxi driver and shooting him five times in the back. *Id.* at 22, 89. The cab driver was paralyzed as a result of this incident. *Id.* at 89.

On May 13, 1977, McCottrell committed his third and final offense at the San Jose Lodge in San Jose, California. *Id.* at 14-15. McCottrell was staying in a room at the lodge when he called the hotel manager, Douglas Voll, and informed him that his room heater

---

[1] McCottrell had only served ten years in Illinois prison before he escaped. Pet.'s Exh. V at 90. McCottrell claims that Illinois has an active hold on him based on his escape, and that if the court granted his habeas petition, he would be forced to return to Illinois to serve out the rest of his sentence there. McCottrell's Pet. at 13. Even assuming this is accurate, it has no bearing on this court's review of the Board's finding of unsuitability.

was malfunctioning. *Id.* at 15. When Voll arrived at the room, McCottrell pointed a gun at him and forced Voll to take him to the manager's office. *Id.* McCottrell forced Voll and his night clerk, Sharon Svoboda, to give McCottrell all the money from office drawers. *Id.* at 15.

McCottrell proceeded to force Voll and Svoboda into a bedroom where Voll's wife was sleeping. *Id.* McCottrell shot Svoboda first, in the head and the hip. *Id.* at 15-16. He proceeded to shoot Voll, and when Voll began to struggle with him, he stabbed and beat Voll on the head with the pistol. *Id.* at 16. McCottrell then attempted to strangle Voll, shattering Voll's dentures and breaking his finger in the process. *Id.* Voll's wife was able to escape and call the police. *Id.*

McCottrell left the lodge and was arrested just minutes after committing the offense, while walking down North First Street in San Jose. Pet.'s Exh. V at 20. The arresting officer was patrolling the street when he saw McCottrell walking past with blood on his jacket. *Id.*

**C.  State Court Decisions**

 **1.  Parole Board**

At McCottrell's October 18, 2004 parole hearing, the Board opened by reviewing McCottrell's commitment offenses. *Id.* at 14-21. The Board proceeded to question him about both his criminal acts prior to the commitment offenses, and his acts during his prison term. *Id.* at 25-26. In 1966, at age 17, McCottrell was arrested in Illinois for rape, burglary, and armed robbery. *Id.* The Illinois state court tried him as an adult and sentenced him to a term of 50 to 100 years in prison. *Id.* at 26. After serving ten years in Illinois state prison, McCottrell escaped to California. *Id.*

The Board continued with a brief review of McCottrell's family and educational history. *Id.* at 26-28. He has been married twice and is still married to his second wife. *Id.* at 26. He completed his GED and earned a Bachelor of Arts degree while serving his term at the Illinois state prison. *Id.* at 35.

Subsequently, the Board focused its attention on McCottrell's post-conviction

conduct. *Id.* at 28-34. McCottrell founded a youth outreach program entitled Project Last Chance Juvenile Diversion Program. *Id.* at 28. He also upgraded vocationally in the fields of computer programming, typesetting, and photography. *Id.* at 31-32. McCottrell did receive two "disciplinary's" prior to 1990, but he has been discipline-free since then. *Id.* at 28-30. He was even commended for performing the Heimlich maneuver on a choking correctional officer. *Id.* at 31.

Finally, the Board considered McCottrell's psychiatric evaluations and overall mental health. *Id.* at 35-41. His most recent evaluation indicated that he was a "very low risk for violence in the future." *Id.* at 35. He was diagnosed with Anti-Social Personality Disorder in 1988, but no subsequent evaluations reaffirmed that finding. *Id.* at 36. One of the Board's examiners went so far as to characterize McCottrell as "a stable, insightful man." Pet.'s Exh. V at 36.

The Board proceeded to allow Santa Clara Deputy District Attorney Ronald Rico and McCottrell's counsel, Kenneth Wine, to question McCottrell at the hearing, and to make brief statements in support of their respective positions on potential parole. *Id.* at 48-79. District Attorney Rico argued that, if released, McCottrell would still pose a substantial risk to the public safety. *Id.* at 67-74. District Attorney Rico explained that while serving his prison term for ten years in Illinois, McCottrell advanced vocationally, working on his college degree and obtaining EMT certification. *Id.* at 69. Whenever McCottrell was out of prison, however, he committed crimes, including a second rape offense in Illinois committed while he was out of prison pending trial on his first rape offense, kidnapping during his escape from Illinois state prison, and following his escape, the California commitment offenses, for which he is currently imprisoned. *Id.* at 69-71.

In response, Wine argued that McCottrell has behaved extremely well in prison and has done everything he could to rehabilitate himself. *Id.* at 75-79. Wine stressed the fact that McCottrell was much younger when he committed his offenses. *Id.* at 75. Wine claimed that, after serving over 27 years in prison, McCottrell has had time to reevaluate his life and that he has done everything society could ask him to do to rehabilitate himself.

*Id.* at 78. Wine closed by stating that, at 57 years old, McCottrell is an older man and that even if he is released, he would still have five to ten years left to serve in Illinois state prison on his earlier sentence. *Id.* at 79.

McCottrell followed the attorneys' statements with a statement on his own behalf. *Id.* at 79-85. McCottrell accepted responsibility for his criminal actions and expressed remorse for his victims. *Id.* at 80. The Board closed the proceedings by allowing Sharon Svoboda to make a victim impact statement. *Id.* at 86-87. Svoboda noted that as a result of the shooting, she permanently lost vision in one eye and was unable to bear children. *Id.* at 86-87, 90.

In its decision to deny parole, the Board focused on McCottrell's commitment offenses and his prior record of criminal conduct. Pet.'s Exh. V at 89-90. First, the Board recounted the "violent and brutal" manner of McCottrell's commitment offenses. *Id.* at 89. The Board pointed out that there were multiple victims attacked in the same, and in separate incidents. *Id.* The Board reasoned that the shootings were "extremely severe crimes because there was really no provocation for the prisoner to shoot these individuals." *Id.* at 89-90.

Second, the Board referred to McCottrell's prior pattern of escalating criminal behavior. *Id.* at 90. In Illinois, at age 17, McCottrell was arrested and convicted of robbery, burglary, and rape. *Id.* After serving ten years of his 50 to 100 year term, he escaped to California where he committed the crimes discussed above. *Id.*

The Board commended McCottrell for his exemplary institutional behavior over the last several years. *Id.* at 90-91. The Board noted that since 1990, McCottrell has remained discipline free, upgraded vocationally, and participated in court-offered self-help programs satisfactorily. *Id.* at 91. In addition, it found that his most recent psychiatric report was positive, and that his parole plans were realistic, and included a place to live with his wife and a job offer with St. Vincent DePaul. *Id.*

However, the Board concluded that "the positive aspects of his behavior did not outweigh the factors of unsuitability." *Id.* The Board reasoned that McCottrell's

5

commitment offenses and prior history of criminal conduct weighed in favor of a finding of unsuitability. *Id.* The Board complimented McCottrell on his presentation and encouraged him to continue to participate in prison-offered self-help programs until his next hearing. *Id.* The Board denied McCottrell parole and set the next hearing to take place after one year. *Id.*

### 2. State Courts

The Santa Clara County Superior Court denied McCottrell's habeas petition on November 10, 2005. Pet.'s Exh. Y at 1. In a brief statement, the court explained that it had reviewed the transcript from McCottrell's 2004 parole hearing and examined it "in light of the recent cases of *In re Dannenburg* and *In re DeLuna*." *Id.*; *In re Dannenburg*, 34 Cal. 4th 1061 (Cal. 2005)[2]; *In re DeLuna*, 126 Cal. App. 4th 585 (Cal. Ct. App. 2005). The court concluded that the Board's decision "[wa]s supported by its reliance on evidence that [McCottrell] shot five different people during his criminal career." Pet.'s Exh. Y at 1.

The California Court of Appeal summarily denied McCottrell's petition on July 17, 2006. Resp.'s Exh. I at 1. The California Supreme Court denied McCottrell's petition for review. Resp.'s Exh. J at 1.

## ISSUES

McCottrell's current federal habeas petition challenges the Board's twelfth denial of

---

[2] The California Court of Appeal recently decided a subsequent habeas corpus case involving petitioner Dannenburg. *In re Dannenburg*, No. H030031, 2007 WL 3408290, at *8 (Cal. App. 6 Dist. Nov. 16, 2007). The *Dannenburg* cases from 2005 ("*Dannenburg I*") and 2007 ("*Dannenburg II*") involved different parole hearings and slightly different issues. In *Dannenburg I*, the California Supreme Court reinstated the Board's decision to deny parole, holding that the Board is not required to conduct comparative analysis between the offender's crime and cases of similar gravity. *Dannenburg I*, 34 Cal. 4th at 1081-1083. *Dannenburg II* was a habeas petition based on a later parole hearing than in *Dannenburg I*. In *Dannenburg II*, the Board granted parole and the Governor vetoed, relying on the petitioner's commitment offense to demonstrate his current danger to society, while conceding that petitioner met all other suitability factors and met none of the other unsuitability factors. 2007 WL 3408290, at *8. Thus, the two *Dannenburg* cases are not directly in conflict with one another. *Dannenburg II* is analyzed in more depth subsequently in this order.

6

his application for parole following a parole consideration hearing on October 18, 2004.[3]

McCottrell raises the following three claims:

1) that the state court's decision to uphold the Board's denial of parole was not supported by sufficient evidence and was an unreasonable application of clearly established United States Supreme Court law;

2) that the unsuitability criteria the Board relied on to find him unsuitable for parole are unconstitutionally vague; and

3) that the Board violated his due process right to be free from arbitrary governmental decision-making because the Board was predisposed to deny his release.

## STANDARD OF REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply to this petition since it was filed after the Act's effective date. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light

---

[3]On October 3, 2006, McCottrell received his thirteenth, and most recent, parole denial. Pet.'s Exh. OO. Originally, it was unclear from McCottrell's initial papers whether he was challenging all twelve of his previous parole denials or just the twelfth denial. The court issued an order for further briefing requiring McCottrell to specify which parole hearing he was challenging and whether or not he satisfied the exhaustion requirement. Initially, McCottrell responded by reiterating that he was "specifically" challenging all twelve denials. The state filed an answer, explaining that McCottrell's challenges for the eleven parole denials, prior to the 2004 denial, were barred by the one-year limitation period that the Antiterrorism and Effective Death Penalty Act of 1996 imposes on federal habeas claims. Resp.'s Supp. Answer to Order to Show Cause at 1-2. McCottrell subsequently filed a supplemental response stating that he was challenging only the twelfth denial from October 2004. Pet.'s Supp. Response at 1. He stated that the facts of his prior parole hearings were not included to suggest that he timely challenged those denials. *Id.* at 2. Instead, they were submitted to demonstrate that, similar to his 2004 denial, they were based on the facts of his commitment offenses from 1977, and "did not reflect individualized consideration of the specified criteria." *Id.*

7

of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court authority, and satisfies the requirements of 28 U.S.C. § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-413 (2000). A state court decision is an "unreasonable application" of Supreme Court authority, falling under the second clause of § 2254(d)(1), "if the state court correctly identifies the governing legal principle from the from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court, on habeas review, "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. The court must instead determine it was objectively unreasonable to support granting a writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Torres v. Prunty*, 223 F.3d 1103, 1007 (9th Cir. 2000). Section 2254(d) applies to a state prisoner's habeas petition challenging the denial of parole. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1126-1167 (9th Cir. 2006).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion to ensure that the state courts decided the case on the merits. [4] *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-806 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000). A federal court in a habeas case should apply the following presumption: "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that

---

[4] The Santa Clara Superior Court's denial of McCottrell's state habeas petition was the last, reasoned state court opinion in this case.

8

judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803.

## DISCUSSION

**I.   Clearly Established Federal Law - "Some Evidence" Standard**

McCottrell asserts that the Board's decision finding him unsuitable for parole violated his due process rights. "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). However, if a state's statutory parole scheme uses mandatory language, it may create a presumption that parole release will be granted when or unless certain designated findings are made, thereby giving rise to a constitutionally protected liberty interest. *See Board of Pardons v. Allen*, 482 U.S. 369, 376-78 (1987). In such a case, a prisoner has a legitimate expectation in parole that cannot be denied without adequate procedural due process protections. *Id.* at 373-381; *Greenholtz,* 442 U.S. at 11-16.

California's parole scheme uses mandatory language and is largely parallel to the schemes found in *Allen* and *Greenholtz,* giving rise to a protected liberty interest in release on parole. *Allen*, 482 U.S. at 373-381; *Greenholtz*, 442 U.S. at 11-16; Cal. Penal Code § 3041(b). Pursuant to California Penal Code § 3041(b), the Board will set a release date unless it determines that the gravity of the current convicted offense, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for the individual. Cal. Penal Code § 3041(b). If that is the case, a parole date cannot be fixed at that meeting. *Id.* The Ninth Circuit has held that California's parole scheme creates a presumption that parole release will be granted unless the statutorily defined determinations are made. *McQuillion v. Duncan*, 306 F. 3d 895, 902 (9th Cir. 2002).

"The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to [their constitutionally protected liberty interest in receiving a parole release date] if the Board's decision is not supported by some evidence in the record, or is otherwise arbitrary." *Irons v. Casey*, 479 F.3d 658, 662 (9th Cir. 2002)

(adopting "some evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985)); *see McQuillion*, 306 F.3d at 904 (same); *Sass*, 461 F.3d at 1129 (recognizing "some evidence" standard is required to uphold Board's decision, but denying petition where Board's reliance on gravity of offenses in combination with prior offenses was sufficient); *Biggs v. Terhune*, 334 F.3d 910, 915-17 (9th Cir. 2003) (finding several grounds for denial of parole release date lacked evidentiary support, but denying habeas relief because three other grounds were supported by some evidence). The "some evidence" standard identified in *Hill* is clearly-established federal law in the parole context for AEDPA purposes. *Sass*, 461 F.3d at 1128-29.

In addition, the evidence underlying the Board's decision must have some "indicia of reliability." *McQuillion*, 306 F.3d at 904; *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987). A relevant factor in determining whether the evidence underlying the Board's decision has some indicia of reliability is whether the prisoner was afforded an opportunity to appear before, and present evidence to the Board. *See Pedro v. Oregon Parole Bd.*, 825 F.2d 1396, 1399 (9th Cir. 1987). Accordingly, if the Board's determination of parole suitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision. *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005); *McQuillion*, 306 F.3d at 904.

When assessing whether the Board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. *Irons*, 479 F.3d at 662. Accordingly, in California, the court must first look to California law to evaluate the findings necessary to deem a prisoner unsuitable for parole. Then, the court must review the record in order to determine whether the state court's determination that the Board's decision was supported by "some evidence," itself constituted an unreasonable application of the "some evidence" principle articulated in *Hill*. *Irons*, 479 F.3d at 662.

Determining whether the "some evidence" standard is met "does not require examination of the entire record, independent assessment of the credibility of witnesses, or

10

weighing of the evidence." *Hill*, 472 U.S. at 455. The "some evidence" standard is minimally stringent, such that a decision will be upheld if there is *any* evidence in the record that *could* support the conclusion reached by the disciplinary board." *Powell v. Gomez*, 33 F.3d 39 (9th Cir. 1994) (citing *Hill*, 472 U.S. at 455-456). The main purpose of this standard is to ensure that the Board's findings were not "without support or otherwise arbitrary." *Sass*, 461 F.3d at 1129 (quoting *Hill*, 472 U.S. at 457).

The Ninth Circuit has recently focused on the Board's reliance on the circumstances surrounding the commitment offense as the sole grounds for denying parole. In *Biggs,* the court reasoned that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and *could* result in a due process violation." *Biggs*, 334 F.3d at 916-917. In *Biggs* however, the Ninth Circuit *did* uphold the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration. *Id.* at 917.[5]

The Ninth Circuit's subsequent decision in *Sass* questioned its prior decision in *Biggs.* The court noted specifically that, "[u]nder AEDPA it is not our function to speculate about how future parole hearings could proceed." *Sass*, 461 F.3d at 1129 (determining that it is not a due process violation for the Board to determine parole suitability based solely on the immutable circumstances of the commitment offense). Even more recently, in *Irons*, the Ninth Circuit reiterated its reasoning in *Biggs*, stressing the court's desire that "the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from relevant California statutes." *Irons*, 479 F.3d at 665. However, despite the Ninth Circuit's intimations that parole denial based solely on the commitment offense could result in a due

---

[5] The court cautioned that if "Biggs continue[d] to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." *Biggs*, 334 F.3d at 917; *Rosas*, 428 F.3d at 1232.

11

process violation, it has not created a standard to enable the trial courts to identify such a violation.

### A. Parole Board's Weighing of Unsuitability Factors

It is clearly established federal law that the requirements of due process are satisfied so long as some evidence supports the decisions made by the Board. *Hill*, 472 U.S. at 454. Thus, the relevant issue is whether there is any evidence in the record that could support the decision of the Board in denying McCottrell parole. *Id.*

#### 1. Parole Board Factors Satisfying "Some Evidence" Standard

The Board considered several factors, including the circumstances of McCottrell's commitment offense, in determining whether McCottrell still posed an unreasonable risk of danger to society or a threat to public safety if released, thus making him unsuitable for parole. It is not the duty of this court to re-weigh the unsuitability factors weighed by the Board. *Powell*, 33 F.3d at 42. Instead, the court is limited to determining whether there was some evidence to support the Board's decision. *Id.*

##### a. Commitment Offense

McCottrell claims that his right to due process was violated because he was denied parole based on the unchanging facts of his commitment offenses. The Board may consider the gravity of the commitment offense in assessing an inmate's suitability for parole. Cal. Penal Code § 3041(b). The circumstances of the commitment offense support a finding of unsuitability if the "prisoner committed the offense in an especially heinous, atrocious, or cruel manner." 15 Cal. Code of Regs. § 2281(c)(1).

The Board reflected on the circumstances surrounding McCottrell's commitment offenses, focusing first on the fact that the offenses were carried out in a "violent and brutal manner." Pet.'s Exh. V at 89. The Board considered the fact that multiple victims were attacked and injured in separate incidents. *Id.* In addition, the Board stated that the method in which the crimes were committed demonstrated a "disregard for human suffering." *Id.*

The Board also considered McCottrell's motivation for committing the crimes, in

comparison to the gravity of the offenses. 15 Cal. Code of Regs. § 2281(c)(1)(E). McCottrell shot five individuals over the course of the three robberies, in one case shooting a cab driver five times after robbing him of only $60. Pet.'s Exh. V. at 70-71. The Board explained that "[it] felt that these were extremely severe crimes because there was really no provocation for the prisoner to shoot these individuals." *Id.* at 90.

The Board properly relied on McCottrell's commitment offenses as a central factor weighing in support of unsuitability for parole.

### b.     Prior History of Violence

In addition to the circumstances of the commitment offenses, the Board considered McCottrell's prior record of violence. 15 Cal. Code Regs. § 2281(c)(2). The Board cited McCottrell's "escalating pattern of criminal conduct" as an unsuitability factor in denying his parole. *Id.* The Board focused on McCottrell's criminal history in Illinois. Pet.'s Exh. V at 90. At age 17, McCottrell was arrested, tried as an adult, and convicted of robbery, burglary, and rape. *Id.* at 25, 90. He was sentenced to serve 50 to 100 years in Illinois state prison. *Id.* at 26. He served ten years of his sentence and was behaving well, when he escaped and came to California where he committed the offenses at issue in this case. *Id.* at 90.

McCottrell's conviction for rape at age 17 supports the prior history of violence factor because it demonstrates that he committed serious assaultive behavior at an early age. 15 Cal. Code Regs. § 2281(c)(2). The Board appropriately considered McCottrell's prior criminal history and escalating pattern of conduct as an unsuitability factor.

### c.     Conclusion

The Board's decision was supported by the nature of McCottrell's commitment offense and his prior record of violence. The Board *did* recognize McCottrell's positive behavior while in prison and considered those positive factors in its evaluation. Pet.'s Exh. V at 90-92. The Board commended McCottrell on his institutional behavior exclaiming that he received only two "disciplinary's" during his term and none since 1990. *Id.* at 90-91. He also took advantage of in-prison programs by upgrading vocationally in photo typesetting

13

and computer programming, and by taking advantage of self-help opportunities. *Id.* at 91. Finally, the Board stated that his psychiatric report was also supportive. *Id.*

The weight given to each factor and the manner in which the factors are balanced is within the Board's broad discretion, but a decision to deny parole cannot be arbitrary or capricious. *In re Rosenkrantz*, 29 Cal. 4th at 656-657, 677. The Board may rely on some of the unsuitability factors more than others, but the some evidence standard is minimal and does not require overwhelming evidence in support of the Board's decision. *Hill*, 445 U.S. at 454.

In its very recent decision in *Dannenburg II*, the California Court of Appeal held that the Board cannot rely solely on a prisoner's commitment offense to support a denial of parole. 2007 WL 3408290, at *8 (Cal. App. 6 Dist. Nov. 16, 2007). There must be some evidence to support the decision to deny parole based on the statutory factors, rather than just some evidence supporting a particular factor. *Id.* (citing *Rosenkrantz*, 29 Cal. 4th at 658).

*Dannenburg II*, however, is distinguishable from McCottrell's case. In *Dannenburg II*, the Governor explicitly conceded the presence of *every* relevant suitability factor and the absence of *any* unsuitability factor. *Id.* In the present case, the Board's analysis demonstrated that it considered McCottrell's prior criminal history as an unsuitability factor in addition to the circumstances of his commitment offenses. In *Dannenburg II*, the petitioner did not have any criminal history aside from his commitment offense.[6] *Dannenburg II*, 2007 WL 3408290, at *4. Additionally, Dannenburg "maintained a blemish-free conduct record" while imprisoned. *Id.* In contrast, McCottrell received two "disciplinary's" during his prison term, though he has remained discipline-free since 1990. Pet.'s Exh. V at 28-30.

---

[6]The *Dannenburg II* court stated that, "the quantity and quality of Dannenburg's consistent and spotless record of upstanding conduct for the last twenty years, coupled with the absence of *any negative factors* and the presence of *every conceivable positive factor,* combine to eliminate any modicum of predictive value that his commitment offense once had." *Dannenburg II*, 2007 WL 3408290, at *9.

The Board's decision is due a great deal of deference. The Board's finding of unsuitability based on the nature of McCottrell's commitment offense, combined with his prior criminal history, is sufficient to support its decision denying parole. The evidence the Board provided was sufficient to deny McCottrell's parole without violating his right to due process. Thus, there was no constitutional violation and the state courts' rejection of McCottrell's petition was not contrary to, or an unreasonable application of, clearly established United States Supreme Court law.

**II.     Unsuitability Criteria are Not Unconstitutionally Vague**

McCottrell also argues that the regulatory language the Board used to determine that he was unsuitable for parole was unconstitutionally vague as applied to him. McCottrell primarily challenges the regulation set forth in title 15 section 2281(c)(1) of the California Code of Regulations, which the Board uses to determine whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2281(c)(1).[7]

The "Commitment Offense" unsuitability factor includes five further sub-factors which help to clarify the "heinous, atrocious, and cruel" language of the commitment offense factor. *Id.* The sub-factors are as follows:

(A) whether multiple victims were attacked;

(B) whether the offense was carried out in a dispassionate and calculated manner;

(C) whether the victim was abused, defiled or mutilated during the offense;

(D) whether the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human life;

(E) whether the motive for the crime is very trivial in relation to the offense.

---

[7]McCottrell incorrectly cites title 15, section 2402 of the California Code of Regulations as opposed to title 15, section 2281. The two sections contain identical content, but section 2402 contains parole consideration criteria and guidelines for murders committed after 1978 and specified attempted murders, whereas section 2281 contains parole guidelines for life prisoners. Cal. Code Regs. §§ 2281, 2402. This was most likely a typographical error because McCottrell cited section 2281 earlier in his argument. The change does not affect his argument since the sections are identical.

15

15 Cal. Code Regs. § 2281(c)(1)(A)-(E). McCottrell claims that these sub-definitions provide little guidance to clarify the "heinous, atrocious, or cruel" language of the regulation. Pet.'s P's&A's at 57-62.

In *Arave v. Creech*, the United States Supreme Court considered an Idaho death penalty statute in evaluating whether the Idaho Supreme Court's adoption of a limiting construction, with regards to the statutory phrase "utter disregard for human life," rendered the statute unconstitutionally vague. 507 U.S. 463, 471 (1993). The Court held that the language of the statute would not be unconstitutionally vague unless it was "too vague to provide any guidance." *Id.* The *Arave* Court concluded that the aggravating factor of "utter disregard for human life" was not unconstitutionally vague because one of its clarifying sub-definitions was sufficient to clarify the language of the statute. *Id.* at 471-474.[8]

McCottrell cites *Maynard v. Cartwright*, another death penalty case, in which the Court held that the "especially heinous, atrocious, and cruel" language of a state death penalty statute was unconstitutionally vague. 486 U.S. 356, 359 (1988). However, *Maynard* is distinguishable from *Arave* and the present case. In *Maynard*, the Court stated that the Oklahoma state courts did not adopt a limiting construction sufficient to clarify the "heinous, atrocious, and cruel" language. *Id.* at 359-360. By contrast, the Court in *Arave* found that the state court's one limiting construction was sufficient to clarify the language of the statute. *Arave,* 507 U.S. at 471. Applying *Arave*, the California regulation's five sub-definitions, clarifying the language of the commitment offense, provide more than the "some guidance" necessary to clarify the meaning of the regulation. *Id.* at 471.

In addition, the Board's application of the sub-factors in this case was more than adequate to satisfy any vagueness concerns. The Board considered all the evidence surrounding McCottrell's offense and found that factors (A), (D), and (E) all applied to his case. 15 Cal. Code Regs. § 2281(c)(1)(A)-(E). The Board explained that multiple victims

---

[8] The Court found the following limiting construction was sufficient to meet constitutional requirements: "[A]cts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded pitiless slayer." *Arave*, 507 U.S. at 468, 471.

16

(five total) were attacked over the course of the three offenses. Pet.'s Exh. 2 at 89-90. The Board also described how McCottrell's unprovoked violence during the commission of the offenses demonstrated a callous disregard for human life. *Id.* at 90. Finally, McCottrell's motive of robbery was trivial in relation to the offenses. *Id.* at 89-90. The second offense, the robbery of $60 from the cab driver, resulted in the victim driver being a paraplegic and the third robbery at the San Jose Lodge resulted in a young woman being unable to bear children and permanently losing sight in one eye.

The unsuitability criteria are not unconstitutionally vague, particularly as applied to these offenses, and the Board's application of the factors demonstrate how the Board supported its finding of unsuitability.

### III. The Parole Board Was Not Biased

Finally, McCottrell argues that the Board violated his right to due process because the Board was "pre-disposed to deny his release." Pet.'s P's&A's at 62. McCottrell claims that the Board follows a policy of denying parole to all life-term inmates. *Id.* at 66-69. McCottrell cites a number of United States Supreme Court cases, many dating back to the late 19th century, for the general principle that due process protects individuals against arbitrary action of the state. *Id.* at 63-64. McCottrell fails to cite any case where the facts demonstrate a due process violation based on arbitrary action by a parole board.

In addition, McCottrell provides the declaration and deposition of Albert Leddy, a former Commissioner and then-Chairman of the Board of Prison Terms between 1983 and 1992. See Pet.'s Exh.'s W and X. Leddy claims that during his term, the Board became reluctant to grant parole to life-term prisoners. Pet.'s Exh. W. at 218. Leddy also asserts that after former California Governor Pete Wilson was elected in 1990, he implemented a policy of denying parole to a majority of life inmates. *Id.* While Leddy's record demonstrates his relevant experience working in California's parole system, it is unclear how much support Leddy's declaration provides for McCottrell's claim.

McCottrell's argument relies solely on Leddy's opinions. McCottrell fails to provide any case law demonstrating any instances where the Board's denial of a life-term prisoner

17

was determined to be arbitrary and capricious. The Board provided McCottrell with the opportunity to be present at the hearing, to have counsel present with him at the hearing, and both McCottrell and his attorney had opportunities to give statements in support of McCottrell's case. Cal. Penal Code § 3041.5. McCottrell was advised of his rights including the right to an impartial panel and when the Board asked whether he was satisfied that these requirements were met, McCottrell's attorney replied on McCottrell's behalf that he was. Pet.'s Exh. V at 11.

Moreover, Leddy's opinions are based on his experience from his tenure with the Board, which ended 15 years ago. In addition, Governor Wilson has been out of office since 1999, so any alleged anti-parole policies he may have implemented would be irrelevant for the purposes of McCottrell's 2004 denial. McCottrell fails to provide sufficient evidence to demonstrate that the Board has a policy of denying parole to life prisoners and more specifically, he fails to provide any support for the argument that his October 2004 denial was decided by a biased Board. As a result, McCottrell fails to persuade this court that his parole denial was predetermined or the result of a biased Board.

## CONCLUSION

For the reasons set forth above, McCottrell's petition for a writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated: December 21, 2007

PHYLLIS J. HAMILTON
United States District Judge